IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| LINDA A. HILLARY, ) | Civil Action No. 3:10-1148-RMG-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

## **ADMINISTRATIVE PROCEEDINGS**

Plaintiff applied for DIB and SSI on June 13, 2007, alleging disability as of February 15, 2007. Plaintiff's applications were denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). After a hearing held September 12, 2008, at which Plaintiff appeared and testified, the ALJ issued a decision dated December 2, 2008, denying benefits and finding that Plaintiff was not disabled. The ALJ, after hearing the testimony of a vocational expert ("VE"), concluded that work exists in the national economy which Plaintiff could perform.

Plaintiff was forty-two years old at the time of the ALJ's decision. She has a high school education, with past relevant work as a packer, yarn cleaner, bobbin stripper (pull-over on machine),

sewing machine operator, and cook. (Tr. 22, 144). Plaintiff alleges disability due to residuals of right knee surgery (arthritis), obesity, depression, and anxiety.

The ALJ found (Tr. 15-24):

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.

2. The claimant has not engaged in substantial gainful activity since February 15, 2007, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: residuals of right knee surgery; obesity; depression; and anxiety (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform work with restrictions that require simple, routine tasks; a supervised environment; no required interaction with the public or "team" - type interaction with co-workers; no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; no standing and /or walking over 4 hours in an 8-hour workday; no crouching, kneeling, and climbing; no crawling; no foot pedals or other controls with the right lower extremity; and avoidance of hazards such as unprotected heights and dangerous machinery.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May 13, 1966, and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

>   transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from February 15, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

On March 24, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (Tr. 1-3). Plaintiff then filed this action in the United States District Court on May 6, 2010.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

## **MEDICAL EVIDENCE**

On February 1, 2007, an MRI of Plaintiff's right knee revealed a medial meniscal tear, degenerative changes of Plaintiff's lateral meniscus, a possible sprain of her ACL, and

chondromalacia.[1]  Tr. 236.   Dr. Kevin J. O'Shea, an orthopedic surgeon, examined Plaintiff on February 6, 2007.  Plaintiff complained of continued significant knee pain over the medial aspect of the knee joint line.  Dr. O'Shea diagnosed Plaintiff with a right knee medial meniscal tear and performed arthroscopic surgery on February 15, 2007.  Tr. 232-236.

On February 26, 2007, Dr. O'Shea noted that Plaintiff was "doing well" and was improving overall.  He recommended that Plaintiff continue with physical therapy and stay off work for another two weeks.  Tr. 231.  On March 12, 2007, Dr. O'Shea stated that Plaintiff could progress her activities and noted that she was going to return to work in a couple of weeks.  Tr. 230-231.

Dr. O'Shea noted that Plaintiff was doing better overall on March 30, 2007, but still had soreness on the medial aspect of her knee, especially with prolonged standing.  Plaintiff was concerned that she would be unable to go back to work.  Examination revealed that Plaintiff had mild effusion and medial joint line tenderness.  Dr. O'Shea provided Plaintiff with a Lidocaine and Dexamethasone injection to try and settle down her soreness.  He advised Plaintiff to stay off work for a month.  Tr. 229.

On April 25, 2007, Plaintiff complained again of medial joint pain.  Dr. O'Shea provided Plaintiff with a Synvisc (joint fluid) injection.  Tr. 228.  He performed additional Synvisc injections on May 1 and 8, 2007.  Tr. 226, 227.  On May 22, 2007, Plaintiff reported some improvement with the injections.  Dr. O'Shea noted that x-rays of Plaintiff's right knee showed medial compartment

---

[1]Chondromalacia is "softening of the articular cartilage, most frequently in the patella." Chondromalacia patellae involves "pain and crepitus over the anterior aspect of the knee, particularly in flexion, with softening of the cartilage on the articular surface of the patella and, in later stages, effusion."  Dorland's Illustrated Medical Dictionary, ("Dorland's") 356 (30th ed. 2003).

4

narrowing consistent with mild arthritis. He recommended that Plaintiff try to go back to work. Tr. 225.

Plaintiff complained of persistent left knee pain, as well as persistent chondromalacia of the medial femoral condyle on June 1, 2007. Plaintiff reported she tried to go back to work, but could not stand for any prolonged period of time. Dr. O'Shea assessed left knee pain with some moderate chondromalacia. He administered a Lidocaine and Dexamethasone injection. Dr. O'Shea recommended that Plaintiff stay off work (with follow up in two months) and recommended a permanent restriction from doing work that involved prolonged standing or walking. He opined that Plaintiff needed "more of a desk type job." Tr. 224.

On July 6, 2007, Dr. Carl E. Anderson, a state agency physician, reviewed Plaintiff's medical records. Dr. Anderson opined that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently climb ramps and stairs; frequently balance, stoop, kneel, crouch, and crawl; occasionally climb ladders, ropes, and scaffolds; and should avoid concentrated exposure to hazards. Tr. 238-245.

Plaintiff complained of persistent knee pain on July 3, 2007. Dr. O'Shea noted that Plaintiff had no effusion and her patella was stable and non-tender. He continued Plaintiff's prescription for Celebrex and planned to consult with another physician regarding Plaintiff's treatment options. Tr. 255. A bone scan showed increased radiopharmaceutical activity in Plaintiff's right knee and tibial

plateaus on July 26, 2007. Tr. 251. On July 31, 2007, Dr. O'Shea recommended that Plaintiff undergo right knee osteochondral transfer and high tibial osteotomy.[2] Tr. 254.

On October 30, 2007, it was noted that Plaintiff had some postoperative pain since her recent surgery, but was doing well overall. X-rays revealed that Plaintiff's hardware was in good position. Dr. O'Shea assessed healing proximal tibial osteotomy with osteochondral allograft transfer ("OATS") of the knee. He planned to have Plaintiff continue to be non-weight bearing for four weeks. Tr. 258. On November 27, 2007, Dr. O'Shea noted that Plaintiff was doing much better with regard to her pain and her motion was improving. He allowed Plaintiff to start weight bearing. Tr. 302.

Dr. Xanthia Harkness, a state agency psychologist, reviewed Plaintiff's medical records on November 27, 2007. She opined that Plaintiff's anxiety was not a severe impairment because it resulted in only mild restriction of Plaintiff's activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. Tr. 260-273.

On December 3, 2007, Dr. Dale Van Slooten, a state agency physician, opined that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours in an eight-hours workday; and sit about six hours in an eight-hour workday. He also thought that Plaintiff could frequently climb ramps and stairs; frequently balance and stoop; occasionally kneel, crouch, and crawl; and occasionally climb ladders, ropes, and scaffolds. Tr. 274-281.

---

[2]Osteotomy is "the surgical cutting of a bone." Dorland's at 1337.

6

Plaintiff reported that she was doing much better on December 17, 2007. Dr. O'Shea noted that Plaintiff was still using crutches, but found that her range of motion was improved and she had "really minimal tenderness." He advised Plaintiff to progress her ambulation and wean off the crutches. Tr. 301.

On January 15, 2008, it was noted that Plaintiff was doing better and had been working on an exercise bike. She had only mild swelling and quite good range of motion. Dr. O'Shea advised Plaintiff to continue work on a strengthening program. Tr. 298. He completed a form stating that Plaintiff could not work for six weeks. Tr. 300. On February 26, 2008, Plaintiff said she had some soreness and pain in the medial aspect of the knee at the joint line, but was doing better. X-rays revealed a healing osteotomy in good alignment and no change in position. Dr. O'Shea advised Plaintiff to progress her ambulation and activity. He completed a form indicating that she could not work for another two months. Tr. 297, 299.

On March 24, 2008, Plaintiff reported that she had some medial joint line pain over the previous week, but had been better after taking prescribed pain medication. Dr. O'Shea's examination revealed mild to moderate medial joint line tenderness, but full range of hip and knee motion. X-rays of her hip were normal. Dr. O'Shea administered a Lidocaine and Dexamethasone injection to Plaintiff's right knee. Tr. 296.

Plaintiff complained of continued knee pain and feeling discouraged about her progress on March 14, 2008. She reported that her pain was worse with ambulation or walking. Dr. O'Shea noted that Plaintiff had tenderness, but no swelling and normal range of motion. He observed that she was "a bit obese" and had a "very large leg." X-rays revealed that the tibial osteotomy was

7

well-healed and the hardware was intact. Dr. O'Shea prescribed Lortab and opined that Plaintiff might need to consider repeat surgery. Tr. 295.

On April 8, 2008, Plaintiff reported continued knee pain and that the last injection gave her only temporary relief. She complained of difficulty with ambulation and any prolonged standing, but indicated she did not have very much pain at rest. Dr. O'Shea noted that Plaintiff had full range of knee motion, negative anterior and posterior drawer tests, and negative Lachman's test.[3] She was stable with varus and valgus stress. Tr. 294.

An MRI on April 10, 2008 revealed an osteochondral defect and medial and lateral meniscal tears. Tr. 290. On April 25, 2008, Dr. O'Shea performed another right knee arthroscopic surgery. He noted that Plaintiff had right knee osteochondral defect and medial meniscal tear with chondromalacia. Tr. 291-292. Plaintiff had "quite good" range of motion and was stable with varus and valgus stress on May 5, 2008. Tr. 289.

On May 12, 2008, Dr. O'Shea completed a continuing disability claim form, opining that it was unknown when Plaintiff would be able to return to work. Tr. 284. On May 19, 2008, he wrote on a medical treatment certificate that Plaintiff was "totally disabled" and could not work "at this time." Tr. 283.

On June 6, 2008, Plaintiff reported she had been doing better overall until a couple of weeks previously, when she started having some increasing pain over the medial aspect of her knee. She complained of continued difficulty with walking and that she was starting to have pain in her other

---

[3]In drawer tests, used to test the integrity of the cruciate ligaments of the knee, "the knee is flexed to a 90° angle; at the femoral-tibial junction, if the tibia can be drawn too far forward there is rupture of the anterior ligaments (*anterior drawer t.*) and if it can be drawn too far back there is a rupture of the posterior ligaments (*posterior drawer t.*)." Dorland's at 1871. Lachman's test is "an anterior drawer test for cases of severe knee injury, performed at 20 degrees of flexion." Id. at 1875.

8

knee. On examination, Plaintiff had some mild swelling and tenderness to palpation, but had full range of motion. Dr. O'Shea recommended that Plaintiff continue taking anti-inflammatory medication and work on a strengthening program. He prescribed Skelaxin for muscle spasms. In the "history" portion of this treatment note, Dr. O'Shea stated he did not think Plaintiff qualified for disability based on her significant knee arthritis, but in the "plan" section he wrote "I do think she has significant disability from her knee arthritis and should qualify for social security disability." Tr. 288.

Plaintiff reported persistent pain over the medial side of her knee that was worse with prolonged standing and prolonged walking on July 8, 2008. Dr. O'Shea noted that Plaintiff had no effusion and her surgical wounds were well-healed. Plaintiff had full range of motion and was stable with varus and valgus stress. Lachman's, anterior drawer, and posterior drawer tests were negative. X-rays of Plaintiff's right knee revealed a well healed osteotomy and some narrowing of the medial joint line. Dr. O'Shea diagnosed Plaintiff with right knee pain with arthritis. He did not think that Plaintiff had any further surgical options and did not feel that she would be able to continue working and being on her feet all day. He thought that it was appropriate for Plaintiff to apply for disability. Tr. 287.

Plaintiff consulted Dr. James E. Ford, a psychiatrist, on August 6, 2008, for complaints of depression associated with her knee injury. There were no abnormalities on Plaintiff's mental status examination. Dr. Ford noted that Plaintiff had been terminated from her job on May 7, 2007. He diagnosed major depressive disorder and panic disorder by history and assessed Plaintiff's GAF as 50 (serious symptoms or serious difficulty in social or occupational functioning). Dr. Ford prescribed Cymbalta for Plaintiff's depression. Tr. 304-305.

On September 3, 2008, Dr. Ford noted that Plaintiff had not been able to tolerate a 60 milligram dose of Cymbalta. Plaintiff complained of an increase in depressive symptoms, social isolation and withdrawal, and ongoing anxiety and panic attacks. Dr. Ford found that Plaintiff was fully oriented and cooperative, fidgety and slightly agitated, distractible, had some difficulties with memory functioning, and was depressed and tearful. He diagnosed major depressive disorder and panic disorder by history, assigned a GAF score of 45, and prescribed Lexapro for depression. Tr. 312-313.

Also on September 3, 2008, Dr. Ford completed a mental residual functional capacity ("RFC") evaluation form in which he stated that Plaintiff had major depression and a panic disorder. He opined that Plaintiff was unable to meet competitive standards in the areas of carrying out very short and simple instructions, maintaining attention for two-hour segments, maintaining regular attendance, sustaining an ordinary routine, working in coordination or proximity to others, accepting instructions and criticism from supervisors, getting along with co-workers, and dealing with normal work stress. Tr. 308. Dr. Ford also stated that Plaintiff was unable to meet competitive standards in understanding, remembering, and carrying out detailed instructions. He opined that she had no useful ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and deal with the stress of semiskilled and skilled work. Tr. 307-309.

On September 8, 2008, Plaintiff was treated at the Edgefield County Hospital emergency room for knee pain. She was diagnosed with degenerative joint disease and osteoarthritis. Tr. 317-320.

## **HEARING TESTIMONY AND STATEMENT**

At the hearing before the ALJ, Plaintiff testified that she had undergone three surgeries on her right knee and had knee pain every day. Tr. 33-34. She said she could only be on her feet for five to fifteen minutes at a time. Tr. 37. Plaintiff said she had to elevate her leg during the day. Tr. 40. She also testified that she felt very depressed and spent a lot of her time just lying in bed. Tr. 42. Plaintiff said she was taking anti-depressant medication and that a month previously she had started seeing a mental health counselor every two weeks. Tr. 43-44. Plaintiff said that she did not try to go back to work after her knee surgery because her employer did not have any light duty work available. Tr. 53.

## **DISCUSSION**

Plaintiff alleges that: (1) the ALJ did not perform the analysis of the treating and evaluating physician opinions as required by 20 CFR § 404.1527(d)(1)-(6), SSR 96-2p, and SSR 96-5p; and (2) the ALJ did not explain his findings regarding Plaintiff's RFC as required by SSR 96-8p. The Commissioner contends that the final decision that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence[4] and free of legal error.

---

[4]Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

A. <u>Opinion Evidence</u>

Plaintiff argues that the ALJ erred in failing to consider the opinion of Dr. Ford. Specifically, she asserts that the ALJ never specifically identified Dr. Ford's findings, never analyzed the opinion, and never provided a reason for rejecting the opinion. Plaintiff also argues that the ALJ completely ignored Dr. Ford's assessment in determining her mental RFC. She asserts that there are no competing medical opinions by a treating or examining specialist and that the state agency psychologist opinion was prior to the time of her treatment by Dr. Ford. The Commissioner contends that there are numerous factors why Dr. Ford's opinion should be rejected including that it is not supported by the record, Dr. O'Shea did not report mental problems, Plaintiff did not pursue treatment until a month before the ALJ's hearing, the opinion is not supported by Dr. Ford's notes, and Dr. Ford saw Plaintiff only twice before rendering his opinion. The Commissioner appears to argue that even though the ALJ did not expressly discuss Dr. Ford's opinion in terms of whether he rejected it or assigned it great weight, it was clear that he did not give it controlling weight because the ALJ found that Plaintiff retained the RFC to perform simple, routine tasks in a supervised environment with no interaction with public or team-type interaction with co-workers. The Commissioner contends that a failure of articulation is not reversible error because the Court can readily discern substantial evidence for the ALJ's findings.

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. <u>See</u> 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2); <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other

12

substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527. Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

This action should be remanded to the Commissioner because it is unclear from the ALJ's decision whether he properly evaluated Dr. Ford's opinion. It is unclear whether Dr. Ford is a treating physician (such that his opinion may be entitled to controlling weight). Even if Dr. Ford is not a treating physician, the opinion of a source who has examined a claimant is generally entitled to more weight than the opinion of a source who has not examined a claimant. See 20 C.F.R. 404.1527(d). The only other opinion concerning Plaintiff's mental status is that of a non-examining, non-treating physician (Dr. Harkness) which was rendered prior to Plaintiff's mental health treatment. The ALJ noted that a mental residual functional capacity questionnaire confirmed that Plaintiff had been treated for anxiety and depression on two occasions (Tr. 19), but did not address

13

Dr. Ford's opinion. Although the Commissioner points to reasons why the ALJ could possibly discount Dr. Ford's opinion, they were not articulated by the ALJ in his decision.

Plaintiff also asserts that the ALJ failed to properly consider the statements and opinions of Dr. O'Shea and specifically argues that the ALJ erred by discounting Dr. O'Shea's opinion based on Dr. O'Shea's June 6, 2008 notation that he did not think Plaintiff was disabled. Plaintiff argues that this comment by Dr. O'Shea was a scrivener's error as Dr. O'Shea wrote later in the entry that Plaintiff had significant knee arthritis and should qualify for disability. Additionally, Plaintiff argues that there is no competing treating or examining evidence to counter Dr. O'Shea's opinion which is the opinion of a treating orthopedic specialist. Plaintiff argues that Dr. O'Shea's opinion was based on clinical evidence (rather than Plaintiff's subjective complaints) including that on a number of occasions he noted that she had difficulty with any ambulation and prolonged standing and that she had significant knee arthritis. Plaintiff also argues that the ALJ should not have discounted Dr. O'Shea's opinion as being an issue reserved to the Commissioner[5] because Dr. O'Shea specifically indicated Plaintiff's difficulty ambulating as a basis for his opinion.

The ALJ discounted Dr. O'Shea's opinion in part (see Tr. 18 and 22) based on Dr. O'Shea's June 2008 notation (Tr. 288) that he did not think that Plaintiff qualified for disability based on her significant knee arthritis. This note, however, appears to be a scrivener's error, as Dr. O'Shea states later in the entry that Plaintiff had significant arthritis and should qualify for disability. The ALJ

---

[5] A conclusory opinion of disability is not controlling since the issue of disability is the ultimate issue in a Social Security case and the issue is reserved for the Commissioner. See 20 C.F.R. § 404.1527(e)(1); Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027 (10th Cir. 1994); see also Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)(statements that a claimant could not be gainfully employed are not medical opinions, but opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner); King v. Heckler, 742 F.2d 968 (6th Cir. 1984); Montijo v. Secretary of Health & Human Servs., 729 F.2d 599, 601 (9th Cir.1984).

14

should either clarify that this is not a scrivener's error or analyze Dr. O'Shea's opinions of disability in light of what appears to be a consistent note in June 2008.

B.   RFC

Plaintiff argues that the RFC assessment is conclusory and does not contain sufficient rationale or reference to the supporting evidence as required by SSR 96-8p. The Commissioner contends that the ALJ properly found that Plaintiff could perform a range of light work.

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R. § 404.1545(a). Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis...." SSR 96-8. The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. Id.

Here, the ALJ's RFC does not appear to be based on all of the relevant evidence because it is unclear whether the ALJ considered Dr. Ford's opinion. This action should also be remanded for the ALJ to determine Plaintiff's RFC based on all of the relevant evidence.

## CONCLUSION

The Commissioner's decision is not supported by substantial evidence. This action should be remanded to the Commissioner to consider the opinion of Dr. Ford, evaluate Dr. O'Shea's opinion in light of all of the evidence, and determine Plaintiff's RFC based on all of the relevant evidence.

15

RECOMMENDED that the Commissioner's decision be **reversed** pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3) and that the case be **remanded** to the Commissioner for further administrative action as set out above.

                                      Joseph R. McCrorey  
                                      United States Magistrate Judge

April 12, 2011  
Columbia, South Carolina